## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| Katie P., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50078 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER[1]</u>

This Social Security disability benefits case, which is now long running with a large

administrative record, is before the Court a second time.[2] Plaintiff filed her original applications

in 2013, when she was 33 years old. She alleged that she suffered from fibromyalgia,

radiculopathy, a blood clotting disorder, sleep apnea, depression, and anxiety and claimed that

these impairments caused body pains, headaches, concentration problems, and memory loss,

among other symptoms. In 2016, an administrative law judge ("ALJ") found that plaintiff was

not disabled, concluding she could do light work. Plaintiff appealed that ruling, and in 2017,

Judge Johnston ordered a remand primarily based on plaintiff's argument that the ALJ erred in

the fibromyalgia analysis, although other issues were cited as well. *See Katie P. v. Berryhill*, 16

CV 50288, 2017 WL 3720180 (N.D. Ill. Aug. 29, 2017). Judge Johnston found that the ALJ's

analysis was hampered by the lack of a supporting medical opinion and therefore ordered that a

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings
pursuant to 28 U.S.C. § 636(c).

medical expert be called at the new hearing. On remand, a new ALJ was assigned to the case.[3] This ALJ called two experts to testify at a hearing in 2018: Dr. Cheryl Buechner (psychological issues) and Dr. Gilberto Munoz (physical issues). The ALJ then concluded in a written decision that plaintiff was limited to sedentary work subject to various RFC restrictions. In reaching this decision, he relied heavily on the two experts.

In some ways, this appeal has a déjà vu quality to it. In looking back at the briefs from the first appeal, the arguments are similar. The two main argument headings in the 2016 opening brief—that the RFC analysis was incomplete, and the credibility analysis was flawed—are the same two here. Most of plaintiff's physical symptoms are about the same, affecting her in the same general ways. There are a few differences. Plaintiff is no longer complaining directly about the ALJ's fibromyalgia analysis, and she alleges that her memory and foot pain have worsened since that last appeal. Also, the record has grown from approximately 1400 pages to 2500 pages.

The parties' briefs are a study in sharply contrasting approaches. The old expression seeing the forest for the trees comes to mind. Plaintiff's arguments hover at the ground level. She raises narrowly tailored arguments, organized around a few specific symptoms (such as fatigue and memory loss) or particular snippets of the experts' testimony. She ignores large parts of the ALJ's decision and instead isolates the discussion onto particular areas of weakness. To call all these arguments nitpicking would probably be too much, but they are veering towards that side of the spectrum. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistences or contradictions, we give it a commonsensical reading.").

In contrast to plaintiff's more nitty-gritty approach, the Government takes the 30,000-foot perspective—at least in the first half of its brief. It essentially casts the ALJ as a heroic figure

---

[3] After the case was remanded, the Agency consolidated it with a new application plaintiff had filed on August 5, 2016. Dkt.# 15 at 2. Neither side has suggested that this fact changes anything.

admirably cutting through an oversized record and skillfully bringing order to a confusing set of issues. The opening paragraph of its brief concisely lays out the main themes in one fell swoop. It states as follows:

> The ALJ issued a detailed, well-reasoned 24-page decision that explained the ALJ's conclusions and discussed the substantial evidence supporting those conclusions. The ALJ grappled with thousands of pages of evidence, followed instruction from this court to obtain medical expert testimony, and reasonably concluded that plaintiff's residual functional capacity allowed her to perform a reduced range of sedentary work. That ALJ's residual functional capacity finding was directly supported by the expert opinions of a testifying physician and psychologist, as well as myriad treatment records discussed by the ALJ. The ALJ complied with governing regulations and this court's prior remand order. His conclusions were well explained, supported by substantial evidence, and should be affirmed.

Dkt. #20 at 1. This paragraph refers to three broader points developed in the body of the brief. It is worth pausing to consider them because they provide context and perspective when assessing plaintiff's discrete criticisms which pay less attention to this big picture.

**#1 – Degree of Difficulty.** The Government believes the ALJ faced a formidable task. This Court agrees. At around 2500 pages, the administrative record was three to four times longer than the typical record seen by this Court.[4] The ALJ had to digest a lot of information, with a medical history spanning back to 2011. The ALJ was not starting on a clean slate either. To avoid making the same errors that led to the first remand, the ALJ had to fully understand both the prior ALJ's ruling, as well as Judge Johnston's specific remand instructions. Plaintiff had a diffuse and overlapping mixture of physical and mental symptoms whose causes were not always clear. She suffered from fibromyalgia, a complex medical condition not easy to diagnose or treat. *See* SSR 12-2p. Granted, many disability cases involve similar problems and fibromyalgia is not uncommon, but on the whole, the Court believes that the ALJ faced a

---

[4] It is true, as the ALJ noted, that several of the records added after the first remand were duplicates. R. 1500. But even so, it takes some time to determine which ones are duplicates.

particularly challenging task. If there were a degree-of-difficulty multiplier applied, like the ones used to judge Olympic divers, it would be fairly high in this case.

**#2 – Quality of the ALJ's Decision.** The Government argues that the ALJ, on the whole, engaged in a careful and thorough review. After reading the decision and the hearing transcript, this Court agrees. In terms of rhetoric and tone, the ALJ's decision stands out for its measured approach, as will be evidenced in some of the quotes below. The decision is 24 pages, which is roughly double the typical length seen by this Court, but it does not contain excessive boilerplate or undue repetition. The length instead reflects the multiple issues the ALJ was required to confront, such as analyzing the two separate fibromyalgia tests Judge Johnston indicated must be considered. *See* R. 1492-93. The ALJ had to be cognizant of the remand instructions and appears to have explicitly acknowledged and addressed them all. *See, e.g.*, R. 1493 ("As directed by the District Court, the undersigned obtained testimony from a medical expert witness, Dr. Munoz, for additional evidence regarding the claimant's fibromyalgia."); R. 1503 (discussing Judge Johnston's concerns about daily activities).

One way to illustrate the ALJ's careful approach is to compare his opinion to the prior ALJ's opinion. The difference, in a word, is subtlety. Whereas the first ALJ failed to mention fatigue caused by plaintiff's fibromyalgia or the report of consultative examiner Dr. Stientjes, to cite two examples plaintiff criticized in the first appeal, the ALJ this time discussed this evidence in several places. Although plaintiff still believes this analysis was deficient, plaintiff's arguments are now, by necessity, more fine-grained than the first time around. In short, the scrutiny level is higher.

**#3 - Reliance on Experts.** The Government argues that the ALJ reasonably relied on the two experts whose testimony was—in the Government's phrasing—"well-informed," "well-

supported," and "well-explained." Dkt. #20 at 3. The Government emphasizes several points. First, it asserts that both experts reviewed the entire administrative record (with one irrelevant exception). They cited to multiple specific pages showing they had reviewed the record in close detail. The Government rejects plaintiff's suggestion that any failure to mention a particular piece of evidence means that the experts overlooked or ignored that evidence. Second, plaintiff's counsel cross-examined these experts and did not confront them with the evidence counsel now claims was overlooked. *Id.* at 5 (counsel "had an opportunity to question [Dr. Munoz] about [plaintiff's] asserted fatigue," but "chose not to"). The Court finds these arguments persuasive. Although plaintiff now attacks portions of the experts' testimony, plaintiff has not pointed to any medical opinion to directly support her theory of the case.

Having set forth the Government's larger contextual arguments, the Court will now turn to plaintiff's targeted criticisms. They are organized around particular symptoms. The Court will address the three symptoms plaintiff focuses on, and then will discuss her credibility arguments.

**Fatigue.** Plaintiff first argues that the ALJ failed to fully consider her fatigue or account for it adequately in the RFC formulation. Plaintiff concedes, however, that the ALJ did not ignore this symptom. *See* Dkt. #15 at 8 (the ALJ "accepted that [plaintiff] suffers from fatigue, both in the context of fibromyalgia and her mental health conditions"). The ALJ referred to it numerous times in summarizing the record, noting both the favorable and unfavorable evidence.[5]

Plaintiff first argues that the ALJ took a cramped approach in finding that plaintiff's fatigue would "only affect her in the context of driving or in caution around physical hazards"

---

[5] *See, e.g.*, R. 1498 (noting plaintiff's "complaints of chronic pain and fatigue"); R. 1501 ("Fatigue is somewhat more prevalent in the claimant's psychiatric treatment notes (discussed below), but the claimant nevertheless remains alert, oriented and cooperative on examination."); R. 1507 ("Claimant did mention symptoms such as headaches, feeling tired during the day and ringing in her ear in her counseling records[.]").

(referring to two RFC restrictions) and by failing to consider that this problem "affects her more broadly." Dkt. #15 at 9; Dkt. #21 at 4. Plaintiff claims that her fatigue would affect her ability to concentrate on work tasks. Dkt. # 15 at 9.

The Court finds that this argument fails to consider the decision as a whole in a fair way. *See generally Jeske v. Saul*, 955 F.3d 583, 594 (7th Cir. 2020) (courts should consider the entire "context and content" of various statements in the decision). It is true that the ALJ stated at one point that the RFC restrictions on driving and hazards were included in part to account for fatigue, but this does not mean that this was the only place where this symptom was accommodated. The ALJ limited plaintiff to sedentary work largely because the ALJ found that her symptoms were tied more to walking rather than prolonged sitting. R. 1502. Plaintiff has not disputed this particular finding. Similarly, the ALJ included RFC limitations designed to address plaintiff's alleged difficulties in concentrating (e.g. low stress work).

Plaintiff's second argument is that the ALJ did not address *all* the fatigue evidence. She provides a string citation to several places in the record where she reported problems with fatigue or concentration, but she does not go on to discuss the evidence in any detail nor make an argument how it all adds up to undermine the ALJ's reasoning. Dkt. #15 at 9. The problem with this type of argument is that the ALJ recognized that plaintiff complained about these symptoms, but found that, *on balance*, this evidence was not significant enough to undermine the ALJ's conclusions. Plaintiff challenges this conclusion, presumably believing that a different balance should have been struck. But plaintiff has not made a convincing argument that the ALJ's weighing of the evidence was wrong. Merely including a string citation is not enough, in part because this record is large and contains many data points. Also, importantly, the ALJ relied on

the experts who reviewed this same evidence, and they did not identify fatigue as being a significant barrier to plaintiff's ability to work.

Returning to the larger issue of context and perspective previously discussed, the Court notes that the ALJ had to consider a long list of varied and overlapping symptoms, both physical and mental. Plaintiff's brief, however, singles out only a few of the symptoms from this list. Fatigue is the symptom she chose to discuss first, and also the one she devoted the most attention to in her opening brief, giving the impression that it was her central medical concern. But plaintiff's testimony does not reflect the same prioritization of this symptom. At the hearing, the ALJ asked plaintiff several times to identify her chief complaints. When asked why she could not work, plaintiff stated: "I've been having bad pain in my back and my hips, and now my foot. I've been having memory problems. I have depression and anxiety issues." R. 1534. Fatigue was not specifically mentioned in this answer. Later on, the ALJ asked the same basic question in slightly different terms, and plaintiff answered:  "Well, the pain is kind of bad, especially like in my foot. I can't stand that long. My memory is kind of getting worse. I kind of never know when it's going to just go blank out on me. And that's never fun." R. 1537. Again, no specific mention of fatigue. Fatigue only came up later in her testimony when counsel specifically asked about it. Plaintiff then agreed that fatigue was a problem and gave as examples that she found it "hard to do the dishes" because "it's just tiring" and found sweeping the vinyl floor "too tiring to do." R. 1542-43. The ALJ, however, had to address all of plaintiff's many symptom allegations and had to make judgment calls about how much discussion to devote to each one. Given plaintiff's testimony, it would not be unreasonable for the issue of fatigue to receive somewhat less attention all things considered.

7

**Memory Problems.** Plaintiff next argues that the ALJ gave short shrift to her memory problems. Here again, the argument begins with the recognition that the ALJ did not ignore this symptom and agreed that plaintiff had some problems. The ALJ summarized both the favorable and non-favorable evidence.[6] However, the ALJ concluded that overall these problems were not so significant (or frequent) as to require additional RFC restrictions. *See, e.g.*, R. 1496 (stating there was "little objective documentation of memory deficits" and that her memory has "usually" been "grossly intact on mental status examinations"). In reaching this conclusion, the ALJ relied on Dr. Buechner's testimony. The Court does not find this analysis to be improper.

Plaintiff's argument is primarily built on criticisms of aspects of Dr. Buechner's testimony. Plaintiff tries to build an argument from an ambiguous portion of testimony where she made a reference to a statement in the record that some neuropsychological testing had been done in October 2017. As it turns out, the testing results were not in the record, a point Dr. Buechner herself noted at the start of her testimony.[7] The ALJ gave counsel the opportunity after the hearing to submit this evidence in the record, but counsel never did so for reasons unknown. In any event, Dr. Buechner stated at one point during her testimony that the memory testing "would have been potentially useful." R. 1550. Plaintiff tries to turn this passing reference into an implicit admission that plaintiff's memory problems were more severe than Dr. Buechner claimed. The ALJ considered this argument and rejected it with the following explanation:

> Dr. Buechner noted the reference in the record to the neuropsychological examination (again, despite the record being kept open, the actual report was not submitted), which suggested that to the extent the claimant experiences memory disturbance, it is attributable to her underlying psychological condition (anxiety and feeling overwhelmed) rather than a neurological cognitive/memory issue.

---

[6] *See, e.g.*, R. 1504 (referring to "memory disturbance, including memory 'blackouts'"); R. 1506 (noting that Rosecrance evaluated plaintiff in August 2016 and observed that her memory was "normal"); R. 1506 (at a January 2017 medical visit, her memory was "grossly intact"); R. 1507 ("reported struggling with her memory during a counseling visit in February 2018").

[7] This observation shows that she reviewed the record carefully.

> The claimant's representative cross-examined Dr. Buechner on this point, arguing that the claimant's memory impairment, even if psychological, should be considered in assessing the claimant's restrictions. Dr. Buechner explained that she had considered it, in assessing moderate restriction with respect to the claimant's ability to adapt and manage herself (i.e. she can respond to feeling stress or overwhelmed by becoming forgetful). However, she did not find a reason in the record to restrict task complexity or work instruction.

R. 1509. The Court does not find this explanation to be unreasonable. As plaintiff herself acknowledged in making this argument, "it is not entirely clear what Dr. Buechner meant" in this portion of her testimony. Dkt. #15 at 10. Given all these factors, the Court finds the ALJ's interpretation to be reasonable.

Another argument directed at Dr. Buechner's testimony about memory problems is that she relied on examination findings from doctors who were treating plaintiff for "physical conditions." Dkt. #15 at 11. But plaintiff has not provided authority for the claim that Dr. Buechner was prohibited from relying on this type of evidence, along with all the other evidence in the record, and this Court is not aware of any such categorical prohibition. As the Government states, the fact that the observations were made by doctors treating physical complaints "does not mean, though, that those providers were incompetent to observe plaintiff's mental functioning or to assess her mental status." Dkt. # 20 at 7.

Plaintiff's final argument is to again claim that the ALJ and Dr. Buechner failed to consider contrary evidence. Plaintiff provides a list of seven citations and argues that Dr. Buechner should have explicitly referenced them. Dkt. #15 at 11. But as discussed above, the Court agrees with the Government that Dr. Buechner was not required to—and practically would have been unable to—discuss every piece of potentially relevant evidence during a hearing lasting in total just over an hour and a half. It is more reasonable to suppose, as the Government states, that Dr. Buechner did not discuss this evidence because she did not find it "dispositive or

conclusive." Dkt. #20 at 8. Also, as the Government points out, this evidence consisted of only "seven pages from a 2542 page" record, making it akin to a needle in the haystack. Dkt. #20 at 7. This raises the important issue of frequency of the normal and non-normal findings. The ALJ concluded that "most" of plaintiff's examinations suggested no significant memory problems. Dkt. #15 at 13. Plaintiff responds by asserting that "various" examinations showed otherwise. But this does not strictly rebut the ALJ's point that, on balance, the normal examinations were more predominant. And again, plaintiff's counsel was at the hearing and easily could have asked Dr. Buechner about these seven pages.

Finally, it is worth looking more closely at plaintiff's specific testimony about her memory. At the hearing, she made two assertions. First, she stated that she has "complete blackouts" twice a year. R. 1539. Second, she stated that she "forgets words" multiple times a day. *Id.* It is not clear why these problems would prevent her from working a "low stress" job with "no high productivity requirements." R. 1497. The former problem, while obviously serious if a bit vague, was very infrequent, and the latter problem is not necessarily incompatible with low stress work. In any event, as discussed below, the ALJ did not fully credit plaintiff's testimony for various reasons, including that she only sought conservative treatment.

**Migraines.** Plaintiff argues that the ALJ insufficiently discussed her headaches, which she testified "last for several hours or days, or continuously for months." Dkt. # 15 at 12. This argument is much shorter than the two above. As plaintiff recognizes, both the ALJ and Dr. Munoz considered this symptom in their analysis and included at least one explicit RFC limitation referencing it, which was a limitation on driving and avoiding hazards such as using physical machinery. R. 1507. Earlier in her opening brief plaintiff claimed that the ALJ had "no evidentiary basis" for not finding that her headaches would have affected other areas such as her

ability to concentrate. Dkt. #15 at 12. However, a few pages later in the brief, in the credibility discussion, plaintiff acknowledged that the ALJ did have a rationale, which was that plaintiff was taking medications for her headaches. *Id.* at 14. The ALJ discussed this evidence in some detail, describing how plaintiff had used Propranolol and Topamax. R. 1501. Plaintiff only briefly attempts to rebut this rationale, but plaintiff's argument is mostly that the headache symptoms varied, and that the improvement was not sustained in her opinion. But the ALJ recognized this counter-argument and incorporated into his analysis as reflected in the following statement summing up the ALJ's reasoning: "While claimant's records intermittently mention headaches, sometimes with suboptimal control, the frequency and persistence of headache complaints in the record is not consistent with greater restrictions." R. 1501. Plaintiff's argument on this point ultimately boils down to a claim that the ALJ should have weighed the evidence differently.

**Credibility.** The last part of plaintiff's brief argues that the credibility analysis was improper. As the Seventh Circuit has repeatedly stated, this Court should not overturn a credibility finding unless it was "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) ("we give the ALJ's credibility finding 'special deference' and will overturn only if it is 'patently wrong'"). Here the ALJ offered several rationales, including the finding that the objective evidence on balance did not support greater limitations, that plaintiff's treatment history was mostly conservative and routine, and that plaintiff's daily activities were not inconsistent with the RFC findings. Plaintiff criticizes these rationales, but the Court does not find these criticisms are enough to order a remand.

Some of plaintiff's arguments have been discussed to some extent above. Specifically, the Court does not find that the ALJ lacked a sufficient basis for finding that the objective evidence relating to the three symptoms (or to the other symptoms), on balance, supported the

11

ALJ's findings. This conclusion flowed directly from the two expert witnesses. For example, on the issue of carpal tunnel syndrome, a topic not previously discussed, the ALJ discussed the results from an EMG and other related examination findings to support the limitation to frequent handling. R. 1501.

Plaintiff argues in several places that the ALJ failed to consider that some of her symptoms varied over time. But the ALJ repeatedly acknowledged this very fact. *See, e.g.*, R. 1500 ("notwithstanding intermittent pain exacerbations" and "intermittent antalgic gait/limping"). Although it is true that the Seventh Circuit has held that the variability of symptoms should be considered, especially in cases of fibromyalgia, we agree with the Government that it is not enough to simply intone that symptoms may have varied. Dkt. #20 at 12. As discussed above, both the ALJ and the two experts concluded that the overall frequency and severity of these symptoms was not to the degree that it supported plaintiff's more extreme allegations. Without a more detailed argument or a contrary expert opinion, this Court has no basis to second-guess these findings regarding the nature and variability of the symptoms.

The treatment history was another of the ALJ's rationales, one plaintiff does not discuss in much detail. As the Government argues, the ALJ reasonably concluded that the treatment recommendations of medication and exercise could be "considered to be routine treatment modalities." Dkt. #20 at 10 (citing R. 1499, 1503, 603). The Government notes, for example, that the ALJ relied on this treatment rationale regarding the carpal tunnel allegations, noting that plaintiff "did not seek additional cortisone injections between 2013 and 2018 and had not been using her hand splints." *Id.* Plaintiff has not contested these conclusions in any substantive way.

As for daily activities, the Court does not find the ALJ gave undue weight to this factor. The Seventh Circuit recently summarized the competing concerns ALJs must consider:

> An ALJ may not equate activities of daily living with those of a full-time job. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). But an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities.

*Jeske*, 955 F.3d at 592. Here, as in *Jeske*, the ALJ did not make the improper leap of finding that plaintiff's activities were "as demanding as those of full-time work." *Id.*

Instead, the ALJ reasonably discussed certain activities. Here, as the ALJ did throughout the opinion, the ALJ took a careful and measured approach, as demonstrated in the following statement:

> While it would be inappropriate to conclude that the claimant could perform these activities frequently (or even up to 1/3 of a workday, i.e., occasionally) in a work setting, it is reasonable to conclude from these activities (*along with other factors in the record*, including normal objective examination findings, only intermittent complaints regarding some impairments, and the opinion of an impartial medical witness) that the claimant is not incapable of sustaining any work activity (or that she is incapable of leaving home unaccompanied).

R. 1504 (emphasis in original). The activities included plaintiff's use of a bicycle for her primary mode of transportation, roller skating, and walks to the public library, among other things. Although there is some uncertainty about the frequency of the roller skating (plaintiff suggests she was merely trying this out once), the Court cannot find that the ALJ erred in relying on these activities, especially since the ALJ made it very clear they were not dispositive. The ALJ could have reasonably found it somewhat inconsistent that plaintiff claimed to be too tired to wash the dishes, but still had the time and energy to try roller skating, to cite one example.

To sum up, based on the above arguments, the Court finds that there is substantial evidence supporting the ALJ's decision. To the extent that the Court has not addressed all of plaintiff's specific arguments, the Court relies also on the Government's brief, which contains additional supporting arguments. In considering whether to remand this case, the Court cannot

13

avoid looking at the practical question of whether a remand for a third round of administrative proceedings would likely result in any clearer resolution of the issues now under dispute. It is not clear what, if any, additional fact-finding steps would change the overall picture which has been stuck in the same position for many years. Plaintiff has not suggested any such steps. In her first appeal, plaintiff could legitimately claim that the ALJ played doctor given that no medical opinion clearly supported the ALJ's analysis. However now, after the ALJ called two experts to testify, this argument is not available. Plaintiff has had ample time over the long arc of this case to procure a medical opinion to strengthen her case, but she has not obtained one. If this Court were to remand this case, the record would inevitably be even longer. No ALJ decision is likely to be perfect, especially given the after-the-fact scrutiny that can be applied by experienced counsel combing through a long record looking for omissions or missteps. Two separate ALJs have ruled against plaintiff by finding her testimony not fully credible. While it is possible that a third ALJ would find her more credible and would agree with her arguments about the evidence, the Court does not find that the alleged errors by the current ALJ justify another remand.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: May 13, 2020                              By: 
                                                    Lisa A. Jensen
                                                    United States Magistrate Judge